# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY,

### OCTOBER TERM, 1880.

---

THEODORE RUNYON, ESQ., ORDINARY.

---

In the matter of the propounding for probate of a paper writing purporting to be the last will and testament of JOSEPH L. LEWIS, deceased, late of Hoboken, and a paper purporting to be a codicil thereto.

A testator was eighty-two years old in 1873, when he made his will.—*Held,* that if it be conceded that he was miserly, squalid, dishonest, profane and irascible; that he canceled a codicil to his will merely because he believed the beneficiary named therein, who was not a relation, was insincere towards him; that, in 1860, he revoked a trust deed in the nature of a testamentary disposition of his property (it appearing that he believed that he had, by its provisions, retained power to do so); that, in 1867, he revoked an absolute gift of certain stocks; and that he gave the bulk of his estate to his executors in trust to reduce the debt incurred by the United States in subduing the rebellion—he having no legitimate kindred who might, by the creation and execution of such trust, be disinherited or disappointed in their natural expectations—those things did not establish testamentary incapacity.

---

*Mr. Robert Gilchrist,* for the proponents.

*Mr. A. Q. Keasbey, Mr. Cortlandt Parker* and *Mr. Edwards Pierrepont,* of New York, for the United States.

*Mr. John P. Stockton,* attorney-general, for the state of New Jersey.

*Mr. B. Williamson* and *Mr. Russel,* of New York, for John S. Cathcart and others.

*Mr. J. C. Besson,* for Jessie Benson and her children.

*Mr. M. W. Niven,* for the overseer of the poor of Hoboken.

*Mr. Gilhooly* and *Mr. Perry,* of New York, for Thomas Lewis and the children of Mary Lewis.

THE ORDINARY.

The testator, Joseph L. Lewis,.then of Hoboken, in this state, died March 5th, 1877, aged about eighty-six years. On the 1st of October, 1873, he executed, in Jersey City, in the office of Messrs. Gilchrist & McGill, a law firm then existing, of high standing, an instrument of writing of that date, purporting to be his last will and testament. It was executed in the presence of three witnesses, with all due legal formalities. By it he provided first for the payment of his debts and funeral expenses, and then gave as follows : To John, Lewis, Margaret and Joshua J. Benson, children of his friend, Joshua Benson, of Hoboken, as a memorial of his regard and esteem, the house and lot in Hoboken where he then resided (described in the will as on the westerly side of Bloomfield street, and known as No. 326, and as the same conveyed to

NOTE.—For constructions of gifts and devises for the benefit of the country, or for the payment of the national debt, see *Newland* v. *Att'y-Gen.,* 3 *Meriv.* 684; *Nightingale* v. *Goulburn,* 5 *Hare 484,* 2 *Phil. 594; Ashton* v. *Langdale,* 15 *Jur. 868; United States* v. *Fox,* 52 *N. Y. 530,* 94 *U. S. 315; Dickson* v. *United States,* 125 *Mass. 311.*

For gifts to the government or state as trustee, see *Mitford* v. *Reynolds,* 1 *Phil. 185; Levy* v. *Levy,* 33 *N. Y. 99; Att'y-Gen.* v. *Baker,* 9 *Rich. Eq. 521.*

him by William Machold and wife), and to the survivors and
survivor of them, for life; the property, at the death of the sur-
vivor, to go to his or her issue in fee, and if no issue, then to his
or her heir or heirs at law. To Benson and his wife each one-half of
a bond and mortgage, the former made by Benson and his wife and
mother, and the latter given by Benson and his wife and mother,
on the house in which Benson resided in Hoboken, known as
No. 328 Bloomfield street, with all the money due and to become
due thereon, and which, at the testator's death, should remain un-
paid, with the mortgaged premises. To Magdalene J. Johnson,
of Falmouth, in Jamaica, $10,000, to be paid to her as follows:
$500 every six months for the first three years after his death;
$3,500 at the end of the fourth year, and the remaining $3,500
at the end of the fifth year; and he requested that she would
pay to her aged aunt, Frances Grace, $300 a year, in equal quar-
terly payments, so long as the latter should live. To Marianne,
Hermann, Lewis and Lily Batjer, children of his friend Her-
mann Batjer, of the city of New York, by his deceased wife
Marianne, each $1,000, and directed that those sums of money
should be paid by his executors to Hermann Batjer in trust, to
invest them for the children in United States bonds, or stocks of
the state of New York, and apply the interest thereof to the
maintenance and support of the children, or accumulate and capi-
talize the interest for them, as he should see fit, and pay to each
of them, when he or she should reach the age of twenty-one
years, his or her $1,000, and the interest thereon capitalized. To
Jennie Hatfield, daughter of his friend, Gen. James T. Hatfield,
$1,000, to be paid to her father by his executors, on a similar
trust for her as that declared in reference to the gift to the chil-
dren of Mr. Batjer. To Nellie, Madeline and John Lewis,
children of his friend, John S. Harberger, of the city of New
York, $5,000, to be divided between them equally; and he di-
rected that the money be paid to their father, on a similar trust
for them. To Margaret Wolfe, daughter of his friend, John
Wolfe, of the city of New York, $5,000, to be paid to her
father on a similar trust for her. To his long-tried and faithful
friend, George D. H. Gillespie, of the city of New York, $10,000.

To his executors, $5,000 in trust, to pay that sum over to the trustees of the Five Points House of Industry, in the city of New York (incorporated in 1854), or to its treasurer for the time being, to be applied to the uses thereof. To his executors, $500 on the like trust, for the Woman's Hospital of the City of New York. He then directed and enjoined his executors and their successors in the execution of his will and the administration of his estate, to set apart from his estate $2,000, and invest the money in United States bonds or New York state stocks, and keep it permanently invested in good securities, and use the interest, and so much of the principal as might be necessary, in keeping his burial-ground in Greenwood cemetery, and the vault therein, in perfect order and repair, renovating the vault when necessary; and he directed that if it should not be necessary at any time to use all the interest for that purpose, the surplus interest should be capitalized and kept invested in like manne as the principal sum, and be applied to the same purpose. He next made the following bequests of keepsakes:

"*First.* To my friend, James M. Morrison, president of the Manhattan Bank, New York city, my gold duplex watch, numbered 8,468, made by Cooper, London (to mark the vigils kept by him over the pet lamb).

"*Second.* To John Wolfe, his choice of my two line-engraved pictures, La Maddalena del Corregio, by Longhi, 1809, proof impress; and a picture of Venus by Titian, engraved by Pound.

"*Third.* To George D. H. Gillespie, a line-engraved picture, 'Ora Sesta de Notte,' from a painting by Rafael, by Tomas, 1806; also, my large engraved picture, 'Weighing the Deer,' from a painting by Fred. Taylor, engraved by Atkinson.

"*Fourth.* To John S. Harberger, the duplicate engraved picture, 'La Maddelena del Corregio,' proof, 1809; also, a large engraved picture of Rome; also, a book, Encyclopœdia of Gardening, by J. C. Loudon, London, 1827.

"*Fifth.* To Robert Elder, my best fishing-rod, agate-mounted guides, and German-silver reel to match; and a book, Izaak Walton's Complete Angler, plates, Bagster's edition, London.

"*Sixth.* To Maggie Benson, daughter of Joshua Benson, my Oxford edition of the Holy Bible, and my New York edition of the Book of Common Prayer, to match.

"*Seventh.* To Jennie Hatfield, in this my will before mentioned, my diamond brooch, the design of which is a rose flower, and a book entitled 'Milton's Paradise Lost,' two vols., plates, London edition, 1816.

"*Eighth.* To Joshua Benson, my hunting-knife, with rifle pistol attached; also, an engraved picture, 'Castle of Heidelberg;' also, a book entitled 'Health, Diet and Regimen,' by Dr. Graham, London, 1842; also, Col. Hawker on 'Shooting,' plates, London ed., 1830; also, all my household furniture not specifically bequeathed.

"*Ninth.* To John Benson, my case of Colt's revolving pistols, made for me to go to the war of 1861.

"*Tenth.* To Lewis Benson, my case of pistols with barrels one inch long, but nevertheless effective; also my salmon and trout fishing-rod, with reels to match, flies, &c.

"*Eleventh.* To my friend Robert Gilchrist, now attorney-general of the state of New Jersey, my Pompeii ring (monogramic), embracing the portraits of Socrates, Sappho and Plato, obtained by me at Pompeii, Italy, in 1833; and also an autograph letter from Thomas Jefferson, author of the Declaration of American Independence, dated at Monticello, October 10th, 1824, to Joseph L. Lewis, No. 3 Wall street, New York."

He then gave, devised and bequeathed all the rest, residue and remainder of his estate, real and personal, and of every kind whatever, of which he might die seized and possessed, and to which he might at his death be entitled, to his executors in trust, to expend and apply it in reducing the national debt of the United States of America, contracted in the cause of the rebellion of 1861; and he provided that in the execution of that trust his executors, as trustees, might use their discretion as to the manner of applying the residue and remainder to the reduction of the debt, but he strictly enjoined them that they should personally superintend the application of it, that there might be as little waste of it as possible, and that it might not be diverted to other uses by dishonest officials; and, lastly, he appointed his friends George D. H. Gillespie and John Wolfe, executors of his will, exempting them from all accountability for any diminution in the value of his estate, real and personal, by reason of the failure or decrease in value of any of the securities in which it might be invested, or by reason of the failure or decrease in value of any securities in which they might invest it, or any part of it; provided, that at the time of the investment by them the securities in which they invest appear reasonably good to an ordinarily-careful man; and he thereby revoked all former wills.

On the 5th of June, 1875, at the same place, in the presence

of three witnesses, the testator executed, with due formality, a codicil of that date to the will, by which he ratified and confirmed the will, except so far as any part thereof should be revoked thereby, and he thereby revoked the gifts to Joshua Benson and his wife and children, directing that the subjects of the revoked devises and bequests fall into the residue of his estate and be disposed of accordingly by the will.

The will and codicil are propounded for probate by Messrs. Gillespie and Wolfe, the executors, and the admission of them to probate is opposed by John S. Cathcart and others, claiming to be collateral blood relations of the testator, the state of New Jersey, the overseer of the poor of the city of Hoboken, and Thomas Lewis, and the children of his sister Martha, claiming to be lineal descendants, the former the son, and the latter the grandchildren of the testator, and the admission of the codicil to probate is opposed by Jessie, wife of Joshua Benson, and their children. Jane H. Lewis, who claimed to be the testator's widow, and opposed the will and codicil, withdrew from the contest before the hearing. As before stated, the instruments in question were executed with all due legal formalities. The testamentary witnesses were satisfied that the testator had testamentary capacity at the time. From the testimony of Mr. McGill, by whom the will and codicil were drawn, and who had been acquainted with the testator for five or six years before the will was drawn, and had occasionally transacted legal business for him, it is evident that the testator had full capacity in every respect. He says the testator appeared to thoroughly comprehend the act he was doing; that he appeared to be of sound and disposing mind, and of good memory; that the testator gave more consideration and thought to the making of the will than he (Mr. McGill) thought necessary; that ten days or two weeks, or perhaps more, before the will was made, the testator told him that he desired to have him draw his will; that it was a matter about which he wished him to exercise the greatest care; that he desired to have the instrument so drawn that it could not be broken, and that he wished him to give him the skeleton of a will—that is, the formal commencement, the words with which

a bequest or devise is usually begun, and the formal concluding words; that the testator then prepared, in his own handwriting a paper intended as a basis on which the will was to be drawn (it is still extant, and was produced in the cause), and brought it to him and talked over with him each clause in it, and then requested him to draw the will, adhering to the ideas embodied in that paper as the testator had himself drawn it, and had imparted them to him at that conference; and he says that he drew such a will, having at the time the paper which the testator had drawn. He further says that there were conferences between him and the testator on the subject of the will, both at his office and the testator's house. What Mr. McGill terms an intermediate draft of the will was made by him, which was not executed, because it was drawn merely for the purpose of convenient consideration of the provisions of the will to be discussed and corrected, and because it did not include the bequests of the keepsakes, a list of which the testator subsequently gave him to put in the will, and which he inserted accordingly. From that intermediate draft, the will which was executed was copied. Mr. McGill says that he requested the testator to explain what was meant by the language used in the bequest of the testator's watch to Mr. Morrison, president of the Manhattan Bank, "to mark the vigils kept by him over the pet lamb," and the testator replied that Mr. Morrison would understand it. It appears to have been a reference to the bank itself, as the object of the legatee's fostering care and assiduous attention. Mr. McGill testifies that the testator told him that all of his real estate was mentioned in the will, and that he had a box in Manhattan Bank in New York city, containing stocks and bonds, and he desired to know from Mr. McGill, according to what law the bonds and stocks in New York city, would, on his death, be administered, and requested him to be sure to draw the will in such a manner that they would be disposed of by it. He told Mr. McGill that he had been an engraver, and exhibited to him an autograph letter of thanks from Thomas Jefferson as evidence that he had been an expert in his business; and he showed him engravings, also. Mr. McGill says that at the time of the

15

execution of the codicil (he drew that also) the testator was perfectly aware of the act he was doing, and appeared to be of sound and disposing mind and of good memory. He says he saw the testator, and conversed with him frequently between the time of the execution of the will and the time of executing the codicil. The testator appears to have communicated to him his reason for the change made by the codicil, and also the reason for the provision for Benson and his family in the will which it was the testator's design by the codicil to annul, and for which purpose the codicil was executed. The reason for the provision in the will was that Benson had been very kind to the testator, and the reason for making the codicil was that the testator had become, after the making of the will, dissatisfied with Benson's conduct towards him. The particular cause of the change of purpose was, as the testator stated to Mr. McGill, that the testator was convinced that Benson had dealt unfairly with him in regard to money due to him from Benson, and felt satisfied that Benson's attention to him was insincere, and arose from a merely mercenary motive, the expectation of obtaining substantial valuable remembrance by the testator in the distribution of his property by will. There would seem to be no ground for questioning the testator's capacity to make a testamentary distribution of his property, so thoroughly does he, by the testimony of the subscribing witnesses, and the internal evidence of the will itself, appear to have been possessed of all the legal requisites to such an act.

It is urged, however, on the part of the contestants, that he was a kleptomaniac, exhibiting a propensity to pilfer in the larceny of articles of very insignificant value; that he became, towards the close of his life, very parsimonious; that he endeavored to defraud the persons entitled to the estate of one who had been his faithful servant; that he made unfounded charges of theft of his property against a person in his employ in his house; that he used profane language and was unclean and careless in his habits of life; that he was oblivious of the fact that in July, 1858, he had disposed of his property by a deed of trust; that he was under a delusion as to a gift of $10,000 which he made to John S. Cathcart in 1861; the alleged delusion consisting in

his conviction that the gift was in trust, while it was, as the contestants allege, in fact absolute and for Cathcart's sole benefit; and that he labored under other delusions as to the malign intentions of others towards him, to do him mortal injury; and it is urged that these things connected with the fact that, almost entirely ignoring his relations, he gave the great body of his large fortune to be used in paying the debt of the United States incurred by reason of the rebellion of 1861, taken all together, show a mind deranged and deprived of the requisites of testamentary capacity. Miserly disposition and habits, unclean modes of life, dishonesty, even to theft, profanity and violence of temper, of themselves do not affect the claim to testamentary capacity; for obviously, a man may be a thief, a miser, unclean, profane and of ungovernable temper, and yet have testamentary capacity. But it is argued that where, as it is insisted it was in this case, they are found where they did not previously exist, they indicate mental derangement, and are the evidences of a want of the qualifications which go to make up testamentary capacity. But if it be conceded that all that is claimed by the caveators on this head has been proved (a concession which it would be by no means just to make), the facts show no want of capacity. The testator spent his life in the accumulation of property, and up to his death was devoted to the acquisition of wealth. He was never married and had no relations with whom he associated. Indeed, it is alleged, and all the evidence in the cause on the subject is in that direction, that he was of illegitimate birth, the son of a West Indian woman of African descent. When his circumstances are considered, it would not have been surprising if his old age had presented such characteristics as are imputed. It is most manifest, however, from the testimony of Mr. McGill and others, that when he made the will and codicil he was possessed not only of testamentary capacity to the requisite extent to enable him to dispose of his property by will, but of a shrewd and discerning, firm, self-reliant and self-asserting mind and disposition. He knew what property he had, and he selected with great care and discrimination the objects of his bounty.

It is insisted on the part of the Bensons that he labored under

a delusion as to Benson when he made the codicil. When he made the will he believed in the disinterestedness of Benson's service to him and had complete confidence in his integrity, and hence the provision for him and his in that instrument. But after the making of the will he became convinced that Benson was not only insincere, but that he had dealt unfairly with him, or had intended to do so, and hence the change. Benson says the change of disposition towards, him arose from the fact that he had pinned a duplicate, unsigned receipt, purporting to be from the testator to him for money receipted for by the testator, on the bond of Benson and his mother held by the testator. It is difficult to understand why Benson attached the unsigned receipt to the bond, and, on the other hand, perhaps the testator was not warranted in a conclusion unfavorable to Benson's integrity from the circumstance. But there may have been other reasons which were not communicated to Benson. Mr. McGill says the testator gave, as his reason for the change of intention towards Benson, that the latter would not pay him what he owed him, and made unfounded excuses for his default in payment. But whatever may have been the occasion of the change, it was not, it is admitted, without a reason ; and if the testator had causelessly and of the merest caprice changed his intentions towards Benson in a matter of testamentary bounty, the fact could have no weight against the validity of the will or codicil. Of course, it could in no case have any against the former, foi it is the codicil which evidences the change of intention ; the will, it is claimed, was right, and it is not alleged that the testator was under any delusion as to Benson when that was made. It is to be remembered that Benson was not a relation of the testator, and therefore had no claim on his estate from kinship. His expectation of a gift by the will was based on his claim for compensation for services rendered to the testator in a business way.

Nor is there any evidence of delusion in regard to the trust deed before referred to, by which disposition of the testator's property, to take effect after his death, was made. He, in fact, revoked the deed. It is dated in July, 1858, and his receipt to the trustee for the property is dated in December, 1860. The

instrument was evidently (and is proved to have been) of a testamentary character, designed to insure a disposition of his estate after his death, without the cost of protracted litigation. It contained the following initial provision in the declaration of the trust:

" To take possession of and hold all and singular the personal estate above mentioned, during the term of my natural life, subject to my written order and disposition thereof, or any part thereof; and to collect all dividends, interest or income arising therefrom, and to pay the same to me or to my order, from time to time, as the same are collected."

And then follow the provisions which were to take effect after his death. It will be seen that the instrument provides that the funds were to be held during his life, " subject to his written order and disposition." This he undoubtedly understood to give him a power of revocation. In *Forshaw* v. *Welsby, 30 Beav. 243,* a voluntary settlement made by one *in extremis* on his family, and containing no power of revocation on his recovery, was set aside on. his application, on the ground that it was not executed with the intention that it should be operative in case of his recovery from his illness. See, also, *Garnsey* v. *Mundy, 9 C. E. Gr. 243,* and cases there cited. The testator believed that he had power to revoke the trust, and that he had effectually done so. Whether he had such power or not is a question of law. And whether the trust, if it exists, prevents the operation of the will as to any of the testator's property, is a matter which does not enter into the consideration of the question now before me, and can have no influence in determining whether the testator had testamentary capacity.

The testator, in 1861, gave to John S. Cathcart one hundred shares of stock, and subsequently required him to return the proceeds thereof to him, alleging that the property was given upon a trust for the benefit of others. The testator, after the gift was made, became dissatisfied with Cathcart's action, and believing him to be chargeable with a gross dereliction of duty under the trust, demanded the return to him of the fund. Cathcart acceded to and complied with the demand. He, it is true, denied the existence of the trust, declaring that the gift was un-

conditional, but he nevertheless yielded to the demand, and never once even suggested that it arose from a disordered mind. That the testator understood that the gift was not absolute, is abundantly evident. He endorsed Cathcart's letter, dated September 21st, 1867, to his, Cathcart's, agent, directing him to hand over the $10,000 (the amount of the gift), on the testator's giving a receipt for that sum in full of all demands, with a memorandum that the $10,000 were "intrusted to Cathcart for a special purpose unfulfilled &c. &c." There is other evidence also, leading to the conclusion that the gift was, in fact, upon a trust for the benefit of certain persons in Jamaica, who are said to have been the illegitimate relations of both the testator and Cathcart. Apart from these considerations, and regarding it as Cathcart claims to have done, the transaction would be merely that of an absolute, unconditional gift by one to another, afterwards causelessly revoked, and the subject of it voluntarily returned by the donee to the donor on demand. It is needless to say that it presents no evidence of disordered intellect or incapacity.

Nor is the fact that the testator devoted a very large, and by far the greater part, of his estate to the purpose of aiding in paying off the debt incurred in subduing the rebellion, evidence of incompetency. Bequests of like character have been judicially maintained. *Nightingale* v. *Goulburn, 5 Hare 484; S. C. on appeal, 2 Phil. 594; Tudor on Charitable Trusts 14, 15; The Thellusson Case (Thellusson* v. *Woodford), 4 Ves. 227; British Museum* v. *White, 2 Sim. & Stu. 595;* see *2 Story's Eq. Jur.* § *1164.* The question, however, is not whether a gift to such a charity will be upheld, but whether the fact that the testator makes such a bequest is evidence of a disordered intellect and of testamentary incapacity. It obviously is not. It is urged, however, that the fact of the making of such a gift is in this case, connected with the disinheriting of all, or the greater part, of those who had a right to expect to be the recipients of the testator's bounty, and is therefore indicative of incompetency. But it does not appear that the testator had any legitimate kindred. As before stated, he never married. Though a very large amount of testimony was taken in the cause, and the estate

Lewis's Case.

subjected to very great expense in resisting the claim of one who alleged that she was his widow, the claim was at length shown and admitted to be entirely fraudulent, and the result of a criminal conspiracy. Although the opportunity has been afforded to prove that the testator had legitimate relations, no such proof was offered; and the omission is the more significant because, in the outset of the cause, the illegitimacy of the testator was alleged, and evidence taken to establish the fact. Though the testator called the contestant, John S. Cathcart, his nephew, and addressed him as such in epistolary correspondence (and perhaps otherwise), he subsequently denied the relationship, saying that John S. Cathcart and his brother Martin were not his nephews, "except by courtesy." That the testator was attached to the government of this country, and sympathized deeply with it in the crisis of the rebellion, there is ample evidence. He was minded to offer it his personal service as a soldier; and when he yielded, as he readily did, to the suggestion that his age unfitted him for such service, he expressed his determination to aid the government with his pecuniary means, and he accordingly subscribed to its loans at a period when, to some people, such action appeared more patriotic than prudent. It is not surprising that, in his circumstances and with his devotion to the country, he should have been desirous of offering to it the fortune which, under its beneficent institutions, he had been enabled, by his industry, thrift and sagacity, to accumulate. Such gifts are the offspring of lofty sentiments, not of disordered imaginations. James Smithson limited his estate over to the United States of America, to found at Washington, under the name of the Smithsonian Institution, an establishment for the increase and diffusion of knowledge among men, and the gift was carried into effect. A late distinguished citizen of this state gave, by his will, to the state a marine battery which he had in course of construction, and directed that it be completed at an expense not to exceed $1,000,000, out of his estate, before it should be offered to the state for its acceptance. His testamentary capacity was never questioned. In the case in hand, it is not at all improbable that the enthusiasm of the testator for the cause of the Union

was kindled by the fact that the interests of the colored race here were involved in the struggle which arose out of the rebellion, and that his gratitude was excited by the liberation which was one of the results of the contest. But apart from these considerations, obviously no conclusion unfavorable to his capacity is to be drawn from the fact that a testator gives his estate in charity, ignoring his collateral relations. It appears, however, by the will, that the testator was not, in fact, unmindful of his blood relations. He made such provision as he deemed proper for such of them as he desired to provide for. He gave to Magdalene J. Johnson $10,000, with a request that she would pay to her aged aunt, Frances Grace, for life, $300 a year in equal quarter-yearly payments. The testator, for years before the making of the will, was not friendly to the Cathcarts. If he had no legitimate relations (and he does not appear to have had any), those of the contestants who claim to be his relations could derive no advantage from refusing probate of the will. If the will of 1861 made provision for his relations, that will was canceled by the testator in 1872. Benson would be benefited if probate of the codicil were denied, provided probate of the will were granted, but not otherwise. While the evidence produced in opposition to the will and codicil, fails to show that the testator was not possessed of testamentary capacity, the testimony of numerous witnesses (before adverted to), business men who knew him well up to the time of his death, and whose opportunities of knowledge were excellent, abundantly establishes his competency.

Among those witnesses is John S. Harberger, president of the Manhattan Company, a bank of the city of New York, who was acquainted with him from about 1845 up to the time of his death, and knew him well. He says of him:

"As a business man, I have never met with a sounder head, and if you like, (judging) from the care and caution that he invariably exercised in the choice of securities, [having regard to] the price and the revenue to be derived from them; he was a man of strong attachments, and, I might say, of equally strong antipathies (I believe, in the course of my intercourse with him, I never challenged his antipathies); apparently an exacting man, yet I think he never asked me to do anything that was not reasonably just and proper."

He further says that the testator was a man of very strong character—one of the most marked men in character that he ever met in his life; of iron will and inflexible, and almost equally inflexible in his prejudices; naturally suspicious; and, he adds, he was prudent to a fault, except where his antipathies sometimes might, for the moment, disturb his better judgment. He also says that there was not a moment during all his long acquaintance with him in which he showed a lack of understanding or any unsoundness of mind. Mr. Harberger was assistant cashier of the bank from 1857 to 1860, and cashier from the latter date to September, 1879, when he became president. As before stated, his acquaintance with the testator commenced in 1845, and continued up to the time of the death of the latter. He says he saw a good deal of him; that as early as 1845, the testator was the holder of New York city stocks; that his transfer office was that bank, in which the witness paid him interest, as a dealer and stockholder of the bank, for the twenty-five years before his death, and that the testator was one of the depositors of the bank up to the time of his death, and he was occasionally a borrower from the bank; that the witness was accustomed to deal with him personally up to his death, and to talk with him about his business affairs, such as the nature of his investments, the rate of interest for money, and other topics of interest to both of them at the time; that the testator's investments were generally of the best in the market, ordinarily those that paid the highest rate of interest and were most highly esteemed by the majority of investors, and that the investments were selected by the testator himself. Mr. Harberger was on terms of intimate acquaintanceship with him, and saw and conversed with him, on an average, at least twice a week during the last two years of the testator's life, and received a good many letters from him, and altogether had an excellent opportunity of knowing his mental capacity. It appears from the testimony that in his business transactions up to his death, the testator exhibited no evidence of unsoundness. The burden of proof of incapacity is on the opponents of the will. They have by no means established it. On the contrary, it appears, from a care-

ful review and consideration of all the evidence, that the testator, at the time of making both will and codicil, was possessed of full testamentary capacity.

Those instruments will be admitted to probate.